Bret P. Bryce (#13042)
BRYCE LAW P.L.L.C.
140 W 9000 S, Suite 9
Sandy, Utah 84070
(801) 696-4644
bret@brycelawoffices.com
Attorney for Plaintiff Joshua Lee Barnett

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOSHUA LEE BARNETT,<br>    Plaintiff,<br><br>v.<br><br>SHERIFF D. CHAD JENSEN, in his official capacity as Cache County Sheriff;<br>DEPUTY HAYDEN D. WALLENTINE (Badge D117), individually;<br>DEPUTY ANDY J. GUADARRAMA (Badge D112), individually;<br>DETECTIVE M. HEPWORTH, individually;<br>SGT. M. HANSEN, individually;<br>SGT. [FIRST NAME] TANNER, individually;<br>DEPUTY REED TANNER, individually;<br>DEPUTY [FIRST NAME] BOS (Badge D126), individually;<br>DEPUTY [FIRST NAME] PRICE (Badge D87), individually;<br>DEPUTY D. MAUGHAN, individually;<br>CACHE COUNTY SCHOOL DISTRICT, a political subdivision of the State of Utah;<br>LOGAN CITY SCHOOL DISTRICT, a political subdivision of the State of Utah;<br>DEANNA STALLINGS, individually;<br>NICOLE PERKINS, individually;<br>JOHN DOE SCHOOL OFFICIALS 1–5, individually;<br>CARA ANN DUNKLEY, an individual,<br><br>    Defendants. | FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF PURSUANT TO 42 U.S.C. § 1983<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>Case No. 1:26-cv-00049<br><br>The Honorable Ted Stewart |

## INTRODUCTION

This is a civil rights action arising from a sustained, multi-month campaign by officers of the Cache County Sheriff's Office to deprive Joshua Lee Barnett of his constitutional rights as a father. Acting at the direction of and in coordination with his ex-wife, Cara Ann Dunkley, individual deputies twice arrested Mr. Barnett without probable cause on misdemeanor charges. They trespassed him from his children's schools without any court order or lawful process, and weaponized the criminal justice system to prevent him from attending his children's events — including every single one of his daughter's high school tennis matches, Ridgeline High School football and basketball games, and now every track meet in which his son M.B. and daughter L.B. are competing. These acts were not legitimate law enforcement. They were the use of state power as an instrument of a private party's domestic agenda.

Both criminal charges were declined by the County Attorney. The arrests were without lawful basis. The school trespass ban was imposed without court order, written notice, or any process whatsoever. And the officers' own statements confirm that the purpose was not public safety — it was behavioral compliance. In a telephone conversation with Plaintiff's counsel, Sergeant Tanner confirmed that the trespass was a collaborative recommendation between the Sheriff's Office and the school district, that it would remain in place until the situation was "resolved," and that the goal was to ensure that when Mr. Barnett interacted with his children, the matters ongoing in his life did not "crescendo into some kind of dispute on school premises." That is not a law enforcement standard. It is not a legal standard of any kind. It is an open-ended, extrajudicial condition on a father's right to be present at his children's school.

Mr. Barnett brings this action for violations of the Fourth, Fourteenth, and First Amendments to the United States Constitution, for civil conspiracy and joint action under 42 U.S.C. § 1983, and for state law claims including intentional infliction of emotional distress and malicious prosecution. He seeks compensatory damages, punitive damages against the individual defendants, declaratory relief, and a permanent injunction prohibiting the Cache County Sheriff's Office—and all its officers—from enforcing any trespass ban at any school in Cache County or Logan City against Mr. Barnett absent a valid court order entered after notice and hearing.

Discovery in this action will seek, among other things: all communications between Ms. Dunkley and Cache County Sheriff's Office personnel before and after each arrest; all communications between Ms. Dunkley's family law attorney and Sheriff's Office deputies; call logs and email records between any defendant and Providence City Attorney Kelly J. Smith in the months preceding the March 16, 2026 criminal information; and any communications directing which officers were dispatched on August 18 and August 19, 2025 in place of Officer Gerke, who had spoken with Mr. Barnett and agreed to respond. This evidence will demonstrate that the criminal process was not initiated by law enforcement acting independently, but was coordinated, directed, and sustained by a private party using law enforcement as an instrument of domestic litigation.

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). This action arises under 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

2. This action does not seek review of any state court judgment and is not barred by the Rooker-Feldman doctrine. All federal claims arise from Defendants' independent

unconstitutional conduct. Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005).

3. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in the District of Utah pursuant to 28 U.S.C. § 1391(b) because all events giving rise to this action occurred in Cache County, Utah.

5. To the extent the Utah Governmental Immunity Act, Utah Code Ann. § 63G-7-101 et seq., applies to supplemental state law claims, Plaintiff has timely filed or will timely file a Notice of Claim.

## II. PARTIES

6. Plaintiff Joshua Lee Barnett is an adult resident of Cache County, Utah, and the biological and legal father of minor children enrolled in Cache County and Logan City school districts. He holds legal parenting time rights under a court-ordered custody arrangement.

7. Defendant Sheriff D. Chad Jensen is the duly elected Cache County Sheriff, a final policymaker for Cache County law enforcement under Utah Code Ann. § 17-22-1 et seq. He is sued in his official capacity.

8. Defendant Deputy Hayden D. Wallentine (Badge D117) is a sworn deputy employed by the Cache County Sheriff's Office. He is the arresting officer in the August 29, 2025 arrest. He is sued individually.

9. Defendant Deputy Andy J. Guadarrama (Badge D112) is a sworn deputy employed by the Cache County Sheriff's Office. He was involved in the arrest and detention of Mr. Barnett on August 19, 2025. He is sued individually.

10. Defendant Detective M. Hepworth is a detective with the Cache County Sheriff's Office. Beginning in October 2025, he was assigned to investigate the threatening text messages received by Plaintiff's minor son M.B. (Incident No. 25-C8695). His investigation culminated in a December 2025 finding implicating L.B. and potentially Ms. Dunkley, but he closed the case without further investigation of their roles. He is sued individually.

11. Defendant Sgt. M. Hansen is a supervisor in the Cache County Sheriff's Office who participated in the arrest of Mr. Barnett and who, on September 3, 2025, came to Mr. Barnett's office and orally notified Mr. Barnett that he had been trespassed from Ridgeline High School. He is sued individually.

12. Defendant Sgt. [First Name] Tanner is a supervisor in the Cache County Sheriff's Office who served as acting SRO at Ridgeline High School and who, in a telephone conversation with Plaintiff's counsel, confirmed that the school trespass was a collaborative recommendation between the Sheriff's Office and the school district, that it would remain in place until the domestic situation was "resolved," and that the objective was to prevent matters in Mr. Barnett's life from "crescendo[ing] into some kind of dispute on school premises." He is sued individually.

13. Defendant Deputy Reed Tanner is a member of the Cache County Sheriff's Office who participated in follow-up contact with Cara Dunkley. He is sued individually.

14. Defendant Deputies Bos and Price are sworn officers who responded to the August 22, 2025 incident and assisted in gathering evidence for prosecution. They are sued individually.

15. Defendant Deputy D. Maughan is a sworn deputy employed by the Cache County Sheriff's Office. Following the August 29, 2025 arrest, Deputy Maughan conducted a Lethality Assessment Protocol with Ms. Dunkley, entered a lethality finding into the UCJIS statewide criminal database predicting that Mr. Barnett posed a significant risk of lethal violence — without ever speaking to Mr. Barnett or conducting any independent investigation — recommended no bail on a Class B misdemeanor the County Attorney subsequently declined to prosecute, coached Ms. Dunkley to seek a protective order, directed her to CAPSA for assistance, and entered a written psychological diagnosis of Mr. Barnett into an official police report based exclusively on one-sided information. He is sued individually.

16. Defendant Cache County School District is a political subdivision responsible for its policies and for the actions of its employees and school administrators.

17. Defendant Logan City School District is a political subdivision responsible for its policies and for the actions of its employees and school administrators.

18. Defendant Deanna Stallings is the Vice Principal of Ridgeline High School, Cache County School District, who on or about August 20, 2025 prevented Mr. Barnett from speaking with his son M.B. and misrepresented to Mr. Barnett that M.B. did not want to go with his father. Defendant Nicole Perkins is an attendance office employee at Ridgeline High School who was present during the same incident. Defendants John Doe School Officials

1–5 are additional administrators and staff who participated in imposing, communicating, or enforcing the trespass ban against Plaintiff. True names of John Doe defendants will be substituted upon discovery. All are sued individually.

19. Defendant Cara Ann Dunkley is an individual and Plaintiff's ex-wife. She acted in concert with the law enforcement defendants to deprive Plaintiff of his constitutional rights. As a private party acting under color of state law through joint action with state actors, she is subject to suit under 42 U.S.C. § 1983. See Dennis v. Sparks, 449 U.S. 24 (1980).

## III. FACTUAL ALLEGATIONS

### A. Note Regarding Pending State Criminal Proceedings

Defendants may seek abstention under Younger v. Harris, 401 U.S. 37 (1971), based on the criminal information filed in Providence City Justice Court on March 16, 2026 — seven months after the County Attorney declined to prosecute the identical conduct. Abstention is not warranted for five independent reasons.

First, Younger abstention does not bar damages claims; at most it permits a stay pending resolution of the state proceedings. Deakins v. Monaghan, 484 U.S. 193 (1988).

Second, the bad faith exception to Younger applies: a prosecution initiated without a reasonable expectation of obtaining a valid conviction, for the purpose of harassing the defendant, does not warrant abstention. Perez v. Ledesma, 401 U.S. 82 (1971); Dombrowski v. Pfister, 380 U.S. 479 (1965). The justice court prosecution presents exactly those circumstances: the County Attorney declined prosecution for insufficient evidence; no new evidence has been produced; the charges were downgraded from the original arrest; the Information lists as witnesses two children who were not present at the incident; and the filing occurred only after Plaintiff began asserting his

constitutional rights in the protective order proceedings. Plaintiff is filing concurrently with this action a Motion to Dismiss and a Motion to Disqualify prosecuting attorney Kelly J. Smith and the law firm of Olson & Hoggan, P.C. in the justice court proceeding, based on (1) the firm's prior representation of Plaintiff in the underlying custody dispute from which all charges arise, and (2) the firm's concurrent representation of Cache County School District, a named defendant in this federal action — a dual conflict that independently bars the prosecution from proceeding in its current form. Prior to filing this action, Plaintiff's counsel contacted Mr. Smith multiple times by email and by phone regarding the pending justice court prosecution. Mr. Smith did not respond to any of those communications.

Third, the injunctive relief sought in this action relates to the school trespass ban — not to the pending criminal proceeding — and Younger does not bar injunctive relief targeting conduct independent of the state prosecution.

Fourth, Plaintiff is prepared to waive his Fifth Amendment privilege and testify in this proceeding; the criminal case presents no obstacle to full adjudication of the federal claims.

Fifth, to the extent Heck v. Humphrey, 512 U.S. 477 (1994) is implicated by the pending justice court proceeding, Plaintiff notes that Heck does not bar this action at this time because no conviction has been entered. Should the justice court proceeding result in a conviction, Plaintiff's damages claims would be preserved pending any appeal, and the injunctive and declaratory relief claims — including the school trespass ban — are not barred by Heck in any event. Moreover, the § 1983 claims here address conduct that goes well beyond the narrow question of guilt or innocence in the justice court proceeding: the trespass ban, the second arrest, and the pattern of coordinated retaliation are entirely independent of the justice court charges.

## B. Background

19. Joshua Barnett and Cara Dunkley were married for approximately 16 years and share four children together. They divorced approximately five years before the events described herein. Despite five years having passed since the divorce, Ms. Dunkley, by her own admission to Cache County Sheriff's deputies, believes Mr. Barnett is "not over the divorce." Mr. Barnett denies this characterization; he has been attempting to exercise his legal parenting rights in good faith and to be present in his children's lives.

20. Mr. Barnett has long maintained an active and loving presence in his children's education. Prior to the events described herein, he attended his children's school football games, tennis matches, track meets, and other extracurricular events. He has lunch with his children at school approximately once a month. He plays with his younger children on the school playground. He attends games and has accompanied his children to all significant school events.

21. At all times relevant, Mr. Barnett held a valid court-ordered parenting plan entitling him to regular parenting time with his minor children. His adult son Conner Barnett is not a subject of this action. Because they are minors, Plaintiff's remaining children are identified by initials throughout this complaint: his daughter L.B., his son M.B., and his daughter E.B. The children's full names are withheld to protect their privacy.

## B. The Custody Modification Petition and Its Immediate Aftermath

22. This is not the first time Ms. Dunkley has responded to a custody modification petition by generating criminal complaints and seeking a protective order. In May 2021, Mr. Barnett filed a petition seeking 50/50 custody. What followed is a precise template for what

occurred in 2025. Within weeks of the petition, criminal charges were filed against Mr. Barnett — including a charge of electronic communications harassment arising from a text message Mr. Barnett sent to Ms. Dunkley. Ms. Dunkley filed a request for a protective order in July 2021. That first request was denied by the court the same day it was filed. She refiled two days later and obtained a temporary protective order. Additional criminal charges followed — including charges arising from Mr. Barnett taking his son Conner home after a soccer game, and from Conner visiting Mr. Barnett on a non-designated day. All charges were ultimately resolved through pleas in abeyance that were successfully completed and dismissed. The 2021 protective order was dismissed without prejudice in January 2022 — the day before Ms. Dunkley filed a new protective order petition. None of these proceedings resulted in any finding of violence or genuine threat by Mr. Barnett. The same pattern is repeating in 2025. Prior to August 2025, Mr. Barnett had no history of violence and no arrests for any offense against another person outside the context of his custody disputes with Ms. Dunkley. The documentary record — available through the Utah Xchange case management system — reflects the same sequence in both 2021 and 2025: petition to modify custody → protective order petition → criminal charges. In 2021, all charges were ultimately dismissed. In 2025, the charges remain pending — filed seven months after the County Attorney declined prosecution, by a conflicted law firm, on downgraded charges, with no new evidence.

22a.        Ms. Dunkley's retaliatory intent toward Mr. Barnett is evidenced by multiple statements she has made to third parties. First, a witness who spoke directly with Ms. Dunkley confronted her about statements allegedly made at a social gathering. During that conversation, Ms. Dunkley stated words to the effect that it made her happy that Mr.

Barnett was miserable, that he had made her life miserable, and that it was now his turn to suffer. This statement constitutes an admission by a party opponent. Second, in a separate incident approximately six years prior to the events described in this complaint, Ms. Dunkley made statements in front of witnesses — including in the presence of the parties' minor child L.B. — to the effect that she intended to do whatever she could to make Mr. Barnett's life miserable, and that if Mr. Barnett were to harm himself as a result, it would not be her fault. These statements — made directly to and in front of third-party witnesses who are prepared to testify — reflect a sustained retaliatory state of mind toward Mr. Barnett that is consistent with, and provides direct evidence of, the improper purpose underlying the pattern of protective order petitions and criminal complaints described throughout this complaint.

22b.     The justice court prosecution of Mr. Barnett was initiated by Providence City Attorney Kelly J. Smith of the law firm Olson & Hoggan, P.C. Attorney Seth J. Tait of Olson & Hoggan, P.C. represented Mr. Barnett in his divorce proceedings, Case No. 204100345, First Judicial District Court, Cache County — the very custody dispute from which all subsequent events in this complaint arise. In that representation, Olson & Hoggan obtained Mr. Barnett's confidential financial information, his parenting history, his custody strategy, and his personal vulnerabilities as they relate to his relationship with his children and his former wife. Mr. Smith is now using the resources and platform of that same firm to prosecute Mr. Barnett on charges directly arising from that same custody dispute. Compounding this conflict, Olson & Hoggan, P.C. publicly lists both Cache County School District and Logan City School District among its representative clients in its Martindale-Hubbell attorney directory profile — both of whom are named defendants in this federal

action. A firm cannot simultaneously represent a defendant in a federal civil rights action and prosecute the plaintiff in parallel criminal proceedings arising from the same underlying dispute. This creates a serious conflict of interest implicating Utah Rules of Professional Conduct 1.9 and 1.10 — duties to former clients and imputed disqualification of the entire firm. Plaintiff has filed a motion to disqualify in the Providence City Justice Court proceeding. Discovery in this federal action will seek all records of Olson & Hoggan's prior representation of Mr. Barnett, all conflict checks performed by the firm, all records of the firm's representation of Cache County School District, and all communications between Mr. Smith, her firm, and Ms. Dunkley or her counsel preceding the March 16, 2026 filing of the information.

22c.        The retaliatory and punitive nature of Ms. Dunkley's conduct is further demonstrated by the relief she sought in her January 2022 protective order petition (Case No. 224100017). Ms. Dunkley sought to reduce Mr. Barnett's parenting time to two days per month, supervised. At the time of the petition, Mr. Barnett had a valid court-ordered parenting plan providing regular, unsupervised parenting time that he had exercised without incident for years. The request for supervised visitation of two days per month is not a request for protection — it is a request to functionally terminate Mr. Barnett's parental relationship with his children without the evidence required to support such a finding in a custody modification proceeding. The deployment of criminal charges and law enforcement served as the evidentiary predicate for that extreme request, which could not have been obtained through legitimate family court channels on the actual facts. The 2025 protective order petition (Case No. 254100490) follows the same pattern.

23. On or about August 14, 2025 — a Thursday — Mr. Barnett filed a petition to modify the parties' custody arrangement in Case No. 204100345. Ms. Dunkley was served with the petition that same day.

24. Prior to August 14, 2025, L.B. had been attending regular parenting time with Mr. Barnett without incident. There had been zero law enforcement involvement in the parties' custody matter since the resolution of the 2021/2022 proceedings — a period of approximately three years during which Mr. Barnett had been exercising his parenting time without incident.

25. The very next business day after service — Monday, August 18, 2025 — Ms. Dunkley refused to allow L.B. to come home for Mr. Barnett's court-ordered parenting time.

26. Four days after service of the petition — Tuesday, August 19, 2025 — Mr. Barnett was arrested.

27. Five days from service of a custody modification petition to the first arrest. Ms. Dunkley admitted on the stand that she had discussed the divorce and custody proceedings with L.B. — which explains L.B.'s sudden refusal to attend parenting time immediately after service.

28. Every significant adverse event in this complaint — the refusal of parenting time, the call to law enforcement, the arrests, the trespass ban, the protective order — followed directly from the filing and service of the August 14, 2025 modification petition. This is a pattern, not a coincidence.

**C. The First Arrest — August 19, 2025 (Child Abuse, Case No. 25-C7866)**

29. On August 18, 2025 — the day before his arrest — Mr. Barnett called the Cache County Sheriff's Office seeking law enforcement assistance for custodial interference: Ms.

Dunkley was refusing to allow L.B. to come home for his court-ordered parenting time. Mr. Barnett was the victim seeking help. He called law enforcement because he understood it to be the appropriate channel — he had previously been charged with custodial interference for exercising self-help, and specifically sought to involve law enforcement rather than act unilaterally. He did exactly what the system asks parents to do and what had been done to him previously. He spoke with Officer Gerke twice, and Officer Gerke agreed to come to the scene to keep the peace. However, the officers who arrived were not Officer Gerke — they were Deputy Andy J. Guadarrama and Deputy Hayden D. Wallentine. Mr. Barnett did not speak with Deputy Wallentine on August 18. Rather than receiving assistance with his custodial interference complaint, Mr. Barnett's own call to law enforcement was used as a basis to identify, locate, and ultimately arrest him the following day. Ms. Dunkley later identified Deputy Wallentine as the same officer who had been involved in a prior incident involving Mr. Barnett approximately five years earlier. The substitution of Wallentine and Guadarrama — rather than Officer Gerke, the officer Mr. Barnett had actually spoken with — is consistent with the pattern of selectively deploying specific officers in response to calls involving Ms. Dunkley.

30. On August 19, 2025 — which fell within Mr. Barnett's court-ordered parenting time — Mr. Barnett took M.B. and E.B. to lunch at a Chick-fil-A restaurant in Providence, Utah. L.B. had refused to come with him for his parenting time, a refusal that began the day after service of the custody modification petition. While at the restaurant, Mr. Barnett unexpectedly and by chance encountered L.B., who was also there with Ms. Dunkley (who was outside the restaurant). Mr. Barnett was not there to intercept L.B. or confront Ms.

Dunkley — he was having lunch with two of his children when he saw his third child across the restaurant. He went to L.B. and hugged her.

31. Mr. Barnett attempted to speak with L.B. about why she had not been coming for his court-ordered parenting time. This is precisely the kind of parental engagement that reasonable parents engage in — a father asking his daughter why she was refusing to visit him. During the conversation, L.B. walked away. Mr. Barnett placed his hand on her arm to continue the conversation. L.B. went into the bathroom. Mr. Barnett did not follow her. He did not knock on the bathroom door. He did not call or text her to come out. He walked back to his table and continued having lunch with M.B. and E.B. From the bathroom, L.B. called her mother.

32. Ms. Dunkley called the Cache County Sheriff's Office. Deputy Guadarrama responded.

33. Deputy Guadarrama reviewed the Chick-fil-A security camera footage at the scene before making any arrest decision. The footage shows Mr. Barnett and L.B. in conversation. It shows Mr. Barnett placing his hand on L.B.'s arm. It does not show violent contact. It does not show L.B. being injured. It does not show L.B. in distress.

34. Deputy Guadarrama arrested Mr. Barnett for child abuse, a Class A misdemeanor under Utah Code Ann. § 76-5-109. L.B. had no visible injury. No mark, bruise, abrasion, or contusion was noted. No medical treatment was sought. Deputy Guadarrama did not describe any injury in his probable cause affidavit. The PC affidavit reveals an important evolution: the complainant (Ms. Dunkley) reported that Josh had "shoved" L.B. After reviewing the video, Guadarrama did not use the word "shoved" — he softened it to "grabbed ahold of the juvenile victim's arm and pulled her in a violent jerking manner."

The video, which Guadarrama himself describes as showing Josh approaching L.B. and hugging her before the arm contact, contradicts even that softened characterization. The evolution from "shoved" (Cara's account) to "hugged then grabbed" (Guadarrama's video account) to "violent jerking manner" (Guadarrama's conclusion) reflects a progressive misrepresentation of conduct that the video shows was far more benign than either characterization.

35. When subsequently asked by Mr. Barnett's wife Andra Barnett to explain how the conduct constituted child abuse, Deputy Guadarrama stated only that the incident "fit the statute." He did not explain how any element of § 76-5-109 was satisfied. He did not identify any injury. He offered no analysis.

36. Mr. Barnett was held in custody overnight. No Jail Release Agreement was issued in connection with this arrest. No release condition prohibited Mr. Barnett from contacting his children.

37. The Cache County Attorney reviewed the evidence — including the video — and declined to file charges for insufficient evidence. Seven months later, on March 16, 2026, Providence City Attorney Kelly J. Smith of Olson & Hoggan, L.L.C. filed a criminal information in Providence City Justice Court. The information charges three counts arising from the same incident: Disorderly Conduct (infraction), Assault — DV (Class B misdemeanor), and Child Abuse (Class B misdemeanor under § 76-5-109(3)(b)). The original arrest was for Class A misdemeanor child abuse; the justice court information charges a downgraded version. Notably, the Disorderly Conduct charge requires intent to cause public inconvenience, annoyance, or alarm under § 76-9-102(2)(b) — an element entirely absent from a private parenting exchange in a restaurant. More significantly, the

two misdemeanor counts are mutually contradictory: the Assault charge alleges that Mr. Barnett 'created substantial risk of bodily injury' — meaning no injury occurred — while the Child Abuse charge simultaneously alleges that Mr. Barnett 'recklessly inflicted upon a child an injury' — requiring an actual inflicted injury. These charges cannot both be true. The Assault charge is an implicit admission by the prosecution that no injury was inflicted on August 19, 2025 — the very element that child abuse requires. The information lists as witnesses M.B. and E.B., both of whom were present at the Chick-fil-A on August 19, 2025. As of the filing of this complaint, these charges are pending.

38. The justice court information was filed seven months after the County Attorney declined, with no new evidence, on downgraded charges, by a city attorney whose office had no independent investigation of the incident. Plaintiff is informed and believes, based on the pattern of coordination described throughout this complaint, that the decision to file the justice court information was influenced by pressure applied by Ms. Dunkley and her attorney to law enforcement and local prosecutorial authorities. Discovery in this action will seek all communications between Ms. Dunkley, her counsel, and Providence City Attorney Kelly J. Smith, and between Mr. Smith and any Cache County Sheriff's Office personnel, in the period preceding the March 16, 2026 filing. Plaintiff reserves the right to seek leave to amend this complaint to add additional defendants upon completion of that discovery.

39. Following the August 29, 2025 arrest, Mr. Barnett was issued a Jail Release Agreement by an unidentified deputy inside the jail at the time of his release — it was not given to him by Sergeant Hansen ("JRA") as a condition of release. The JRA restricted contact with Cara Dunkley only. Mr. Barnett was never told he could not contact his children — not in

the JRA, not in any release condition from either arrest, and not in any court order. The Temporary Protective Order entered in Case No. 254100490 names only Cara Dunkley as the protected person; the "Other Person(s) Protected" field is blank. Any suggestion in the police reports that a no-contact restriction with L.B. existed was inaccurate and unsupported by any court order.

### D. The School Trespass — August 2025

40. On Wednesday, September 3, 2025, and without the issuance of any court order, written notice to Mr. Barnett, any formal hearing, or any process whatsoever, deputies of the Cache County Sheriff's Office — specifically Sgt. Hansen — came to Mr. Barnett's office and orally informed Mr. Barnett that he had been trespassed from Ridgeline High School, a Cache County School District school attended by his children. Sergeant Hansen specifically told Mr. Barnett that he could not enter or drive his car onto school property, including the parking lot and the parent drop-off and pick-up area at E.B.'s elementary school. The ban extends to all Cache County School District schools — not only Ridgeline High School — and to all Logan City School District properties where his children are enrolled. In a subsequent telephone conversation with Plaintiff's counsel, Sgt. Tanner confirmed the scope of the ban and stated, in substance, that if Mr. Barnett set one foot on school property, Tanner would come and arrest him personally. No written order was issued for either district. No findings were made. No appeal process was identified. The ban covers all school property in both districts where his minor children attend, including parking lots and drop-off zones.

41. The trespass ban was implemented jointly by the Cache County Sheriff's Office and Cache County School District, and upon information and belief has been extended to Logan City School District as well. Upon information and belief, it was implemented at the request of or in coordination with Cara Dunkley.

42. In a telephone conversation with Plaintiff's counsel, Sgt. Tanner confirmed the following: (a) the school trespass was a collaborative recommendation between the Cache County Sheriff's Office and the school district; (b) the school district has the authority to prohibit anyone from its property, and the Sheriff's Office recommended the trespass; (c) the trespass would remain in place until the situation was "resolved" — with no definition of what resolution meant, no identified legal standard, and no identified decision-maker; (d) there had been "numerous incidents" that Tanner characterized as "alarming"; (e) the goal was that when Mr. Barnett interacted with his children, ongoing matters in his life would not "crescendo into some kind of dispute on school premises"; (f) Tanner noted he had "rarely had anyone pitch such a fit" about a trespass and was "not thrilled with how he's handling it"; and (g) either Tanner or Sgt. Hansen would call Mr. Barnett when the trespass order was lifted; (h) Tanner stated that if Mr. Barnett set one foot on school property, Tanner would come and arrest him personally — a direct personal threat of arrest by a supervising officer to Plaintiff's counsel, made without reference to any court order, any pending warrant, or any identified criminal conduct; and (i) Tanner expressed displeasure with Mr. Barnett's practice of calling the Cache County Sheriff's Office to report custodial interference — the very conduct the system requires of a parent seeking to enforce a court-ordered parenting plan without resorting to self-help. The fact that a supervising officer complained to Plaintiff's counsel about Mr. Barnett's use of law enforcement channels to

enforce his court-ordered parenting rights is itself evidence of the viewpoint-based and retaliatory nature of the Sheriff's Office's response. Tanner also indicated he believed the criminal charges had been declined for prosecution. At no point did Tanner identify any court order authorizing the ban, any written notice provided to Mr. Barnett, any hearing, any findings, or any process by which Mr. Barnett could challenge the ban.

43. As a direct result of the trespass ban and the threat of arrest, Mr. Barnett missed every single one of his daughter L.B.'s high school tennis matches during the 2025 season. He was also prevented from attending all Ridgeline High School football and basketball games throughout the 2025-2026 school year. The ban continues into the present: both L.B. and M.B. are now competing on the school track team and the 2026 track season is underway. Beyond athletics, Mr. Barnett has been excluded from all school events on school property — including concerts, plays, award ceremonies, parent-teacher conferences, and any other activity held at a school where his children are enrolled. These are irreplaceable events in his children's lives and in his relationship with them.

44. A full evidentiary hearing on the Temporary Protective Order in Case No. 254100490 was held on January 8, 2026 — over four months after the initial temporary order was entered. Following that hearing, the protective order was entered by the court. Mr. Barnett was subject to a temporary protective order and its attendant restrictions on his parental rights for approximately five months before receiving a full evidentiary hearing. The state court proceeding does not provide, and has not provided, any mechanism for Mr. Barnett to challenge the extrajudicial school trespass ban — which exists entirely outside the protective order and any court order — nor does it address the constitutional dimensions of the coordinated law enforcement retaliation described in this complaint. The absence of

any adequate state-court remedy for the trespass ban and the pattern of constitutional violations underscores the necessity of federal injunctive relief.

45. The protective order obtained by Ms. Dunkley was also deployed to exclude Mr. Barnett from a religious milestone of permanent significance: the baptism of his daughter E.B. At the first protective order hearing on September 18, 2025, Ms. Dunkley testified under oath that she did not want Mr. Barnett to attend E.B.'s baptism. Following that hearing, Mr. Barnett's family law attorney filed a Motion to Enforce and for Sanctions, specifically requesting that Ms. Dunkley be ordered to serve three days in jail for each violation of the court's orders — including her withholding Mr. Barnett from major events in his children's lives such as the baptism. It was only after being served with that motion and the threat of incarceration that Ms. Dunkley, through her attorney R. Christian Hansen, agreed to amend the Temporary Protective Order to permit Mr. Barnett to attend and perform E.B.'s baptism. The amendment occurred at or around the second court date in October 2025. That a mother required the credible threat of jail time before she would allow a father to baptize his own daughter — after having testified she did not want him there — illustrates with precision the purpose to which the protective order was being put: not protection, but exclusion.

46. Mr. Barnett is further prohibited from entering any school property, including the parking lot and the parent drop-off and pick-up area. Sergeant Hansen specifically told Mr. Barnett that he could not enter or drive his car onto school property — including the parking lot or the designated parent drop-off and pick-up zone at E.B.'s elementary school. Mr. Barnett cannot pick up his children from school or drop them off without violating the ban as communicated to him. He must stop a block away from the school and have his children walk to and from his car. He has been unable to have lunch with his children at school,

attend any event, assembly, concert, performance, conference, or other activity held on school property. His wife, who was employed as a dental office employee, was forced to retire from her position to handle school transportation in his place — a commute of approximately 25 minutes each way.

### E. The Second Arrest — August 29, 2025 (Electronic Communications Harassment, Case No. 25-C7991)

47. On August 20, 2025 — the first day of the school year, the day after Mr. Barnett was released from custody following the August 19 arrest — Mr. Barnett went to Ridgeline High School approximately 30 to 45 minutes before the end of the school day to pick up M.B. for his court-ordered parenting time. His purpose was to let M.B. know he was out of jail and that M.B. could come home with him. Ms. Dunkley had blocked Mr. Barnett on M.B.'s cell phone, making direct communication impossible. Mr. Barnett went to the attendance office and spoke with Nicole Perkins. Ms. Perkins left without explanation. Vice Principal DeAnna Stallings then came to the office. Ms. Stallings told Mr. Barnett she would not allow him to check M.B. out of school. She told Mr. Barnett she would not allow him to go to M.B.'s classroom to speak with him. She told Mr. Barnett that M.B. did not want to see him, did not want to speak with him, and did not want to come with him that week. Mr. Barnett found this deeply confusing — nothing had occurred that would have caused M.B. to refuse to see his father. Mr. Barnett left the school. Later that same afternoon, when school let out, Mr. Barnett's wife Andra Barnett texted M.B. that they were in the parking lot. M.B. came out immediately and got in the car. Mr. Barnett and Andra then asked M.B. whether he had spoken with the Vice Principal. M.B. confirmed he had, but said that all he had told her was that he wanted to finish his quiz and that he would call

his father after school. M.B. said nothing to Vice Principal Stallings about not wanting to see his father or not wanting to go to his father's house. Vice Principal Stallings's representations to Mr. Barnett were directly contradicted by what M.B. actually said — confirmed by M.B. himself, and confirmed by the fact that M.B. got in the car without hesitation the moment he was reached. Mr. Barnett believes Vice Principal Stallings had received one-sided information from Ms. Dunkley and conveyed it as M.B.'s own wishes, or confused M.B. with L.B. Deputy Price arrived on scene during the earlier visit and spoke with Mr. Barnett and school administration. Deputy Price was informed by Ms. Dunkley that Mr. Barnett had been sending harassing messages through the parties' co-parenting application. The Cache County Sheriff's Office police reports identify this incident as occurring on August 21, 2025; Mr. Barnett states it occurred on August 20, 2025, and believes the date in the police reports is inaccurate.

48. The messages that formed the basis of the subsequent harassment charge were sent through the Talking Parents co-parenting application — the court-designated platform for the parties to communicate. Talking Parents is specifically designed to produce a tamper-proof, timestamped, third-party-hosted record of all communications, admissible in court proceedings. Neither Mr. Barnett nor any other party can delete, alter, or conceal messages sent through the platform. The messages included Mr. Barnett's expression of grievances about the parties' prior relationship and accusations he had raised previously, as well as communications regarding parenting arrangements and child pickup. The police report (Incident 25-C7991) identifies among the messages characterized as harassing Mr. Barnett's statement to Ms. Dunkley that he would be taking all three children for his court-ordered parenting time. This statement — a parent communicating to the other parent his

intent to exercise his court-ordered parenting rights — was treated by investigating officers as evidence of a criminal harassment pattern. A parent stating he will exercise his court-ordered parenting plan and involve law enforcement if necessary is not harassment. It is the precise conduct the family court system requires of a parent seeking to enforce parenting rights without resorting to self-help. This is not harassment — it is a parent invoking the legally prescribed remedy for custodial interference under a valid court order. The appropriate response to a parent stating he will call police to enforce a parenting plan is compliance with the court order, not an arrest for harassment. The characterization of parental enforcement of a court-ordered parenting plan as criminal electronic harassment reflects the same pattern of weaponizing law enforcement against Mr. Barnett's exercise of his parental rights that pervades this entire case. While the overall tone of the communications was contentious, the messages do not constitute electronic harassment under Utah Code Ann. § 76-12-202, which prohibits harassment through electronic communications with intent to intimidate, abuse, threaten, harass, frighten, or disrupt the electronic communications of another. The proposed charge was a Class B misdemeanor.

49. On August 28, 2025, Deputy Wallentine contacted Mr. Barnett multiple times by phone and text message on the stated premise of helping Mr. Barnett arrange to pick up his children for the Labor Day weekend. At approximately 5:53 p.m. on August 28, Deputy Wallentine sent Mr. Barnett a text message stating: "I was hoping to get in touch with you concerning your parent plan to get your kids for the holiday weekend. I'm at the office if you can swing by to speak with me." The police report for this incident (Incident 25-C7991) separately documents that officers were already aware Mr. Barnett intended to pick up all

three children on August 29 for Labor Day weekend — the same parenting time Wallentine purported to want to help facilitate. The contact was not assistance. It was reconnaissance.

50. On the evening of August 28, 2025, Deputy Wallentine appeared at Mr. Barnett's residence at approximately 9:30 p.m. He told Mr. Barnett: "I know you're home, I want you to come out and talk to me so I don't just go off of one side and write an arrest warrant." This statement, on its face, demonstrates that Wallentine had not yet established probable cause for an arrest—he was explicitly inviting one side of the story before making a determination.

51. Despite the stated purpose of arranging parenting time, and despite having acknowledged on August 28 that he needed to hear from Mr. Barnett before forming a conclusion, Deputy Wallentine had already communicated with Ms. Dunkley and coordinated with the Sheriff's Office to develop a probable cause statement. The probable cause affidavit lists the offense date as August 28, 2025 — the date of Wallentine's own contact with Cara Dunkley, not the date of the messages that form the basis of the charge. The messages Wallentine relied upon were sent on July 16, 2025 and August 4, 2025 — weeks and months before the listed offense date. By listing August 28 as the offense date, the affidavit creates the false impression that harassing conduct occurred on that date, when in fact August 28 was simply the date Wallentine spoke with Ms. Dunkley about prior messages. This misrepresentation is directly contradicted by the underlying police reports in this case, which document the July 16 and August 4 message exchanges in detail. Additionally, Wallentine's characterization of those messages in the affidavit — describing Mr. Barnett as engaging in "psychotic Controll [sic] games" — is Wallentine's own inflammatory editorializing, not language from any message Mr. Barnett actually sent.

52. The warrantless custodial arrest on a Class B misdemeanor also violated Utah Code Ann. § 77-7-2, which limits an officer's authority to make a warrantless misdemeanor arrest — for an offense not committed in the officer's presence — to circumstances where there is reasonable cause to believe the person will flee or that evidence will be destroyed. Neither condition existed. Deputy Wallentine had been in direct telephone and text contact with Mr. Barnett the evening before the arrest and knew his home address, workplace address, and schedule. There was no basis to believe Mr. Barnett would flee. As to evidence: the entirety of the alleged harassing communications existed on the Talking Parents co-parenting platform — a third-party-hosted, tamper-proof application specifically designed to preserve all messages in unalterable form and produce court-admissible records. Mr. Barnett had no ability to delete, modify, or conceal any message on that platform. The evidence was fully preserved at the moment of arrest and required no custodial action to protect it. The warrantless workplace arrest and seizure of three cell phones was therefore unauthorized under state law and unreasonable under the Fourth Amendment.

53. On the evening of August 28, 2025, Deputy Wallentine appeared at Mr. Barnett's home unannounced at approximately 9:30 p.m. Wallentine said he did not want to "go off of one side and write an arrest warrant." That same evening, Wallentine also texted Mr. Barnett offering to help him obtain his children for the Labor Day weekend.

54. The following morning — August 29, 2025 — Mr. Barnett called the Cache County Sheriff's Office to report Deputy Wallentine's conduct and file a formal complaint against him. Mr. Barnett had also spoken with Shannon Demler, an advisor, about the complaint.

55. Deputy Hayden D. Wallentine was assigned to assist Mr. Barnett with filing the complaint.

56. Deputy Wallentine told Mr. Barnett that a formal complaint could not be submitted online. It had to be filled out in person in front of an officer. Deputy Wallentine told Mr. Barnett he had the necessary paperwork and would bring it to Mr. Barnett's office at 64 E Center St, Logan, Utah.

57. Mr. Barnett waited at his office. When Deputy Wallentine arrived, he had no paperwork. He was not there to help Mr. Barnett file a complaint against Wallentine. He was there to arrest him.

58. Deputy Wallentine placed Mr. Barnett under arrest for electronic communications harassment. He handcuffed Mr. Barnett behind his back and seized three cell phones from his desk. The phones were Mr. Barnett's work phones, essential to his business operations.

59. The formal complaint against Deputy Wallentine was never filed. Mr. Barnett was held in custody that day. He missed the Labor Day weekend with his children — the exact parenting time Deputy Wallentine had offered the night before to help him secure.

60. The three seized work phones were retained by the Cache County Sheriff's Office for approximately five to six weeks. Law enforcement was unable to unlock them. No meaningful forensic examination was conducted. The phones were returned without any evidence having been extracted.

61. The proposed charge was Electronic Communications Harassment, a Class B misdemeanor, under Utah Code Ann. § 76-12-202. The Cache County Attorney's Office reviewed the evidence and declined to prosecute. Attorney Andrew Crane informed the investigating detective that there was insufficient evidence to support the charge. Detective Atwood separately sought to have the charge upgraded to felony stalking — a third-degree

felony — under Utah Code Ann. § 76-5-106.5; the Cache County Attorney's Office declined that upgrade on October 13, 2025, finding insufficient evidence. The declination email from Attorney Andrew Crane specifically stated there was insufficient evidence to support the charge. The police report documents that Providence City Attorney Kelly J. Smith was then contacted and confirmed he would refile the lesser charge in his court — establishing that Mr. Smith had direct knowledge of the County Attorney's declination for insufficient evidence before filing the justice court information. The case was referred to the Providence City Justice Court for potential refiling of the original misdemeanor; as of the filing of this complaint, no such charge has been filed. In his conversation with Plaintiff's counsel, Sgt. Tanner acknowledged that the County Attorney had declined prosecution but noted the Justice Court remained a theoretical avenue.

### F. The Lethality Assessment and One-Sided Investigation

62. Following the August 29 arrest, Deputy D. Maughan conducted a Lethality Assessment Protocol (LAP) with Ms. Dunkley and entered the results into UCJIS — the Utah statewide criminal justice database — without speaking to Mr. Barnett, without conducting any independent investigation, and based exclusively on Ms. Dunkley's account. Based on that one-sided assessment, Deputy Maughan concluded that Mr. Barnett "possesses a significant risk to Cara and their children's safety" and that she was "afraid Josh wouldn't learn and his behavior would continue." The LAP screened Ms. Dunkley as high risk to be killed. Deputy Maughan forwarded the LAP result to Deputy Wallentine — the arresting officer — and recommended that he request no bail. This recommendation was made on a Class B misdemeanor charge of electronic communications harassment — a charge the Cache County Attorney subsequently declined to prosecute for insufficient evidence. A

lethality assessment predicting a father's capacity for lethal violence, used to request pretrial detention without bail, on a misdemeanor the County Attorney then declined — entered into a statewide criminal database without a single question asked of the accused — is not a product of legitimate law enforcement. It is a product of coordination with a private party to cause maximum harm to Mr. Barnett through the machinery of the criminal justice system. The police report further documents that Deputy Maughan, following the August 29 arrest, met with Ms. Dunkley and actively encouraged her to seek a protective order, advising her that CAPSA could assist her. A law enforcement officer who has just overseen a lethality screening, recommended no bail, and then personally coached the complainant on how to obtain a protective order has abandoned the role of neutral investigator entirely. The same report reflects Deputy Maughan's written conclusion that Mr. Barnett "appears Josh is not over the divorce, is jealous and is still trying to control Cara's life" — an armchair psychological diagnosis entered into an official police report by a deputy who never interviewed Mr. Barnett, never investigated his side of the custody dispute, and based his conclusions entirely on one-sided information from Ms. Dunkley.

63. Deputy Price's initial report was labeled "THIS IS A ROUGH DRAFT ONLY" and was later supplemented with escalating characterizations. The substance of those escalations tracked information provided by Ms. Dunkley, not any independent investigation.

64. Sergeant Tanner, in his conversation with Plaintiff's counsel, confirmed that no court order existed authorizing the ban and could not identify any process by which Mr. Barnett could challenge or appeal it. He confirmed the ban was a collaborative recommendation between the Sheriff's Office and the school district, conditioned on the "resolution" of undefined domestic circumstances. This confirms the ban was an informal, extrajudicial exercise of

authority imposed on a parent with full legal parenting rights, enforced by a law enforcement agency acting outside the bounds of any judicial process.

### G. Incident 25-C8695 — Threatening Text Messages to M.B. (Detective Hepworth)

65. On September 11, 2025, Joshua Barnett filed a report with the Cache County Sheriff's Office (Incident No. 25-C8695) regarding threatening text messages received by his minor son M.B. while M.B. was attending the Ridgeline High School football game on September 5, 2025. The messages came from phone number 435-760-3796 and began by asking M.B. where his father was and whether his father was at the game with him. When M.B. did not provide the information, the messages escalated to a direct conditional threat: "tell me or I'm going to beat your fucking ass." A 14-year-old child was threatened with physical violence for refusing to disclose his father's whereabouts at a school event.

66. Mr. Barnett reported his concern that the messages were connected to retaliatory conduct by his ex-wife and her new husband, particularly given his recent trespass from the school. Mr. Barnett stated that not many people knew of the trespass (and he had not told any of his children, including L.B. and M.B.) — because the September 5, 2025 football game was only approximately 48 hours after he had been trespassed from the school. The narrow window between the trespass and the threatening messages, and the fact that very few people were aware of the trespass at that point, made Mr. Barnett suspect the messages were a deliberate attempt to create a record that he had violated the trespass ban by being on or near school property during a school event.

67. Detective M. Hepworth was assigned the case in October 2025 and submitted a search warrant to Verizon for subscriber information on the target number. On December 6, 2025,

Verizon returned subscriber information showing the account was held by Jason Hoxie, of Providence, UT, under business name Petrikor Development LLC. The number 435-760-3796 was not L.B.'s real phone number or her friend's real phone number. Upon information and belief, L.B. and her friend used a VPN or Google Voice service to generate a disguised number specifically to prevent the messages from being traced back to them — a deliberate effort to conceal the true origin of the threatening communications.

68. On December 11, 2025, Detective Hepworth contacted Jason Hoxie and learned that the target phone number was associated with Hoxie's 14-year-old daughter. Hoxie's daughter disclosed that it was not she who had sent the threatening messages, but L.B. — Plaintiff's 14-year-old daughter — who had asked her to send them. L.B. had enlisted Hoxie's daughter to text M.B. to find out whether Mr. Barnett was at the game, stating she was scared he might be there. The use of a third party's phone number, and upon information and belief a VPN or Google Voice account to further mask the origin, demonstrates that L.B.'s conduct was not impulsive — it was planned and executed specifically to prevent the messages from being traced back to her.

69. Upon information and belief, L.B. acted under the direction or encouragement of Cara Dunkley. The mechanism by which L.B. knew about the trespass ban is not speculative — it is established by Cara's own testimony. Ms. Dunkley admitted on the stand in the protective order proceedings that she had discussed the divorce and custody proceedings with L.B. The trespass ban was imposed on September 3, 2025. The threatening messages were sent on September 5, 2025 — approximately 48 hours later, when the ban was so new that very few people knew it existed. M.B. did not know about the trespass ban. L.B. did. The only person who could have told L.B. about the trespass ban in that narrow window

was Cara Dunkley. Mr. Barnett alleges that Ms. Dunkley directed or encouraged L.B. to orchestrate the sending of threatening messages to M.B. — using a disguised phone number through a friend's phone to prevent tracing — for the purpose of determining whether Mr. Barnett was present at a school event in violation of the ban, and thereby creating grounds for his arrest. The police report confirms that L.B. told her friend she was scared her dad was on school property. That fear — and the knowledge that his presence would constitute a violation — could only have come from Cara. M.B.'s ignorance of the ban, combined with L.B.'s detailed knowledge of it just 48 hours after its imposition, is itself powerful circumstantial evidence of Cara's role in directing this scheme.

70. Mr. Barnett disclosed to both Detective Hepworth and Sgt. Chesnut that Ms. Dunkley had accessed M.B.'s phone and deleted the threatening text messages. Mr. Barnett had taken screenshots of the messages on M.B.'s phone and sent them to himself as a precaution — but those screenshots subsequently disappeared from M.B.'s phone as well. Mr. Barnett discovered the screenshots in M.B.'s deleted photos folder, where they would be permanently and irrecoverably deleted within 22 days. The text messages themselves had also been deleted from M.B.'s phone. The children's phones are charged in Ms. Dunkley's bedroom every night. Ms. Dunkley and her husband Ryan Dunkley are the only adults with access to the phones during that time. M.B. never discussed the threatening text messages with Ms. Dunkley, and Ms. Dunkley never spoke with M.B. about them. Ms. Dunkley did not report the threatening messages to police. Upon information and belief, Ms. Dunkley accessed M.B.'s phone during overnight charging — without M.B.'s knowledge — and deleted both the threatening messages and the screenshots Mr. Barnett had taken of them. She had no legitimate reason to be in those messages: M.B. had not told her about them,

and she had not reported them to anyone. The deletion was a deliberate act of evidence destruction following Mr. Barnett's report to law enforcement. Mr. Barnett reported this spoliation to Detective Hepworth and Sgt. Chesnut. Neither took any action to preserve, recover, or investigate the deleted evidence.

71. Detective Hepworth closed the case on December 18, 2025, without further investigation of the role of L.B. or Ms. Dunkley in instigating the threatening messages. The irony embedded in this closure is not incidental — it is illustrative of the entire pattern of this case. The messages sent to M.B. constitute, on their face, the very offenses for which Mr. Barnett was arrested and charged. The conditional threat "tell me or I'm going to beat your fucking ass" directed at a minor constitutes Assault under Utah Code Ann. § 76-5-102 — an act done with intent to cause apprehension of imminent bodily injury. The same messages, sent electronically with intent to intimidate, threaten, or frighten, constitute Electronic Communications Harassment under Utah Code Ann. § 76-12-202 — the exact statute used to arrest Mr. Barnett for sending parenting plan messages through a court-designated co-parenting application. Mr. Barnett was arrested, handcuffed at his place of employment, had three phones seized, and was held in custody for sending politely worded messages about exercising his court-ordered parenting rights. The individuals who sent threatening messages to a child demanding his father's whereabouts under threat of physical violence — which the police investigation traced directly to a scheme orchestrated by his own daughter at her mother's direction — were never charged, never arrested, and were the subject of a case that was quietly closed without action. This is not an oversight. It is the operational logic of the coordinated campaign described throughout this complaint.

**H. Harm to Plaintiff and His Children**

72. As a direct and proximate result of Defendants' conduct, Mr. Barnett has suffered severe and ongoing harm including:

(a) Three arrests and detentions, with attendant humiliation, loss of liberty, and reputational harm — including overnight detention on August 19, 2025; detention on August 29, 2025 that caused Mr. Barnett to miss the Labor Day weekend with his children; and a third arrest arising from an alleged violation of the Temporary Protective Order that would not have existed absent the prior unlawful arrests and the one-sided law enforcement conduct that followed;

(b) Total exclusion from his children's school lives for over 8 months, including all of L.B.'s tennis matches, football and basketball games, track meets (both L.B. and M.B. are currently competing in the 2026 track season), playground lunches, and school events; and near-exclusion from performing E.B.'s baptism — a permanent religious milestone — requiring the threat of court action to preserve;

(c) Being required to drop his children off a block from school rather than at the school itself, degrading the normal parental role;

(d) His wife's forced retirement from employment as a dental office employee to drive the children to and from school—a commute of approximately 25 minutes each way—as a direct consequence of the trespass ban;

(e) Significant emotional distress, for which Mr. Barnett now takes prescription anxiety medication;

(f) Harm to his children, who have been led to believe or perceive their father as a criminal, causing or risking emotional harm and potential long-term trauma, and whose identities as his children are bound up in their relationship with him;

(g) Loss of income and economic harm from time spent on arrest proceedings and legal defense;

(h) Attorney's fees and costs in defending the false charges and this action.

73. Mr. Barnett's children have also suffered independent harm. They have been deprived of their father's presence at their school activities through no fault of his own or theirs. The constitutional right of familial association belongs to both parent and child. Troxel v. Granville, 530 U.S. 57 (2000). The perception that their father is a criminal—cultivated by repeated, publicly visible arrests and law enforcement contact directed at him—creates the risk of lasting psychological harm and disrupts the children's sense of family identity.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Fourth Amendment — Unlawful Arrest (August 19, 2025)**
**42 U.S.C. § 1983**
**Against Defendant Guadarrama and John Doe Deputies, Individually**

74. Plaintiff realleges and incorporates all preceding paragraphs.

75. Deputy Guadarrama arrested and held in custody overnight Mr. Barnett on August 19, 2025 without a warrant and without probable cause to believe he had committed child abuse

under Utah Code Ann. § 76-5-109(3)(b). The probable cause affidavit is facially deficient in three independent respects.

76. First, the affidavit contains no element analysis. It describes observed conduct and appends the charge without explaining how any observed fact satisfies any element of § 76-5-109. A PC affidavit that merely recites facts without connecting them to statutory elements does not establish probable cause. Illinois v. Gates, 462 U.S. 213 (1983).

77. Second, the affidavit fails to establish the statutory injury element, which is a threshold requirement of the offense. Under § 76-5-109(1)(a)(ii), "physical injury" means an injury to or condition of a child which impairs the physical condition of the child, including a bruise or other contusion of the skin, a minor laceration or abrasion, failure to thrive, or any other condition which imperils the child's health or welfare. Grabbing a child's arm with no resulting mark, bruise, abrasion, or any described physical or psychological impairment does not constitute an "injury" under the statute. The PC affidavit describes no injury whatsoever — no bruise, no mark, no pain, no psychological harm, no impairment of any kind. Without a physical injury as defined by statute, there is no offense under § 76-5-109(3)(b), regardless of mens rea. The absence of any injury allegation in the PC affidavit is fatal to probable cause on its face. The justice court information filed seven months later similarly charges only that Mr. Barnett "recklessly inflicted upon a child an injury" — with no specification of what that injury was, because there was none.

78. Third, the affidavit's characterization of the contact as a "violent jerking manner" was a false or recklessly misleading statement of material fact under Franks v. Delaware, 438 U.S. 154 (1978). The PC affidavit itself reveals the progression: Ms. Dunkley reported that Josh had "shoved" L.B. Guadarrama then reviewed the Chick-fil-A video. After watching

the video, Guadarrama did not use the word "shoved" — the video contradicted it. Instead he described Josh approaching L.B. and hugging her, then moving to maintain proximity, then grabbing her arm "in a violent jerking manner." That final characterization — "violent jerking manner" — is contradicted by his own description of the same video, which begins with a hug. A person who hugs a child is not engaged in violent conduct toward that child. The escalation from Cara's "shoved" to Guadarrama's "violent jerking" represents a progressive softening that still overstates what the video depicts. Excising the false violent characterization, what remains — a father approaching his daughter, hugging her, moving to maintain proximity, and placing a hand on her arm — does not establish probable cause for child abuse. It is constitutionally and statutorily permitted parental interaction. Deputy Guadarrama's inability to articulate a lawful basis is further confirmed by his own subsequent statement: when questioned by Andra Barnett about the basis for the arrest, Guadarrama stated only that the incident "fit the statute," offering no element analysis whatsoever. That is not probable cause. That is a conclusion. The affidavit also contains a material internal inconsistency: Guadarrama's video description shows L.B. first entering the restroom, then exiting — at which point Josh approached and hugged her — then L.B. attempting to separate, Josh maintaining proximity, the arm grab occurring, and L.B. re-entering the restroom a second time. L.B.'s own statement says she went into the restroom because she saw Josh in the parking lot and became scared. This describes the first bathroom entry — which preceded any physical contact. The second bathroom entry, after the arm grab, is the entry Guadarrama describes in the video. Guadarrama incorporated L.B.'s account of the first bathroom visit without noting that it described a separate event that predated all physical contact — producing an affidavit that conflates two distinct

bathroom visits and falsely implies L.B.'s fear was caused by the arm grab rather than by Josh's presence alone. Yet L.B.'s account, as incorporated by Guadarrama, states she went into the restroom because she "noticed her father in the parking lot and became scared" — an event that would have had to precede the entire physical interaction, not follow it. Guadarrama incorporated this inconsistent account without noting the contradiction, producing an affidavit that presents an internally inconsistent sequence of events. A truthful affidavit would have noted that L.B.'s stated reason for entering the restroom was contradicted by the video timeline. This further supports the Franks challenge to the PC affidavit.

79. Fourth, the charged conduct falls squarely within the parental discipline safe harbor of Utah Code Ann. § 76-5-109(4)(c)(i), which provides that an actor is not guilty of child abuse for conduct constituting reasonable discipline or management of a child, including withholding privileges. The conduct at issue was not merely a physical touch — it was a parental corrective interaction. Mr. Barnett approached L.B. specifically to ask her why she had been refusing to exercise court-ordered parenting time with him. Inquiring of a child why she is refusing to comply with a custody order is quintessential parental discipline and guidance — a father directly addressing his daughter's defiance of a court-decreed obligation. The brief placement of his hand on her arm was incidental to and in furtherance of that parental corrective conversation — an attempt to hold her attention while he engaged her on a subject she was avoiding. The safe harbor protects the full parental interaction: the conversation, the correction, and the physical contact used to maintain that conversation. A parent placing a hand on a child's arm to prevent her from walking away while he asks why she is refusing court-ordered visitation does not result in

serious physical injury, is not criminal, and is not child abuse. No injury was described, no mark or bruise was noted, and the video shows no violent contact. The safe harbor alone negates probable cause as a matter of law. Deputy Guadarrama's failure to consider or apply this statutory exception before arresting a father for this interaction reflects either ignorance of the applicable law or a deliberate choice to ignore it.

80. As a threshold matter, the March 16, 2026 justice court information does not and cannot retroactively establish probable cause for the August 19, 2025 arrest. Probable cause is evaluated at the moment of arrest — not based on what a different prosecutor decides to charge seven months later on a different theory with a lower mens rea. Beck v. Ohio, 379 U.S. 89, 91 (1964) (probable cause assessed by facts known to officer at moment of arrest). The question for this Court is whether Deputy Guadarrama had probable cause to make the arrest on August 19, 2025. The subsequent conduct of prosecutors is relevant only insofar as it illuminates the weakness of the original charge — and it does so powerfully, as set forth below.

81. Fifth, the subsequent justice court prosecution confirms the absence of probable cause at the time of the original arrest. The County Attorney declined. Seven months later, Providence City filed a downgraded information. The original arrest was Class A misdemeanor child abuse — intentional or knowing conduct. The information charges Class B misdemeanor — reckless conduct — under a different subsection. If the conduct was reckless at most, it was not intentional, and the Class A arrest lacked probable cause on its face.

82. Sixth, the justice court information — filed seven months after the County Attorney declined — proves the absence of probable cause through its own charging language. The

Assault count alleges that Mr. Barnett "created substantial risk of bodily injury" — this is § 76-5-102(2)(c), the risk track, meaning Smith is not alleging a completed injury occurred. The Child Abuse count simultaneously alleges that Mr. Barnett "recklessly inflicted upon a child an injury" — § 76-5-109(3)(b) requires an actual, inflicted injury. These charges are mutually exclusive on the same act. Smith cannot allege the arm-grab only created a risk of injury (Assault) while also alleging it actually inflicted an injury (Child Abuse). The Assault charge is a judicial admission that no completed injury occurred — which is the element Child Abuse requires. A reasonable officer at the time of the August 19 arrest, applying the same statutory framework, would have recognized that no injury was inflicted and that the conduct fell within the parental discipline safe harbor.

83. Seventh, the parental discipline safe harbor under § 76-5-109(4)(c)(i) imports into any Assault charge arising from the same conduct by necessary implication. The legislature expressly protected reasonable parental discipline from Child Abuse prosecution. A prosecutor cannot circumvent that protection by charging Assault instead on identical facts. To permit Assault prosecution for conduct the legislature immunized from Child Abuse prosecution would render the safe harbor a dead letter — an absurd result that cannot reflect legislative intent. A reasonable officer would have known this. Deputy Guadarrama's failure to apply it before arresting a father for grabbing his daughter's arm — conduct the legislature expressly protected — was objectively unreasonable and not entitled to qualified immunity.

84. Eighth, the warrantless arrest independently violated Utah Code Ann. § 77-7-2. The charge — child abuse, a Class A misdemeanor — was not committed in Deputy Guadarrama's presence. He arrived in response to a call from Ms. Dunkley after the alleged conduct had

already occurred. A warrantless arrest for a misdemeanor not committed in the officer's presence is authorized under § 77-7-2 only where there is reasonable cause to believe the person will flee or that evidence will be destroyed. Neither condition existed. Mr. Barnett had no reason to flee — he was present, cooperative, and attempting to exercise his parenting time. As to evidence: the only evidence was the Chick-fil-A security camera footage, which Guadarrama had already reviewed and which was controlled by the restaurant, not by Mr. Barnett. Mr. Barnett had no ability to destroy or alter that footage. No exigency existed justifying a warrantless misdemeanor arrest.

85. Ninth, the subsequent filing of a downgraded Class B misdemeanor information does not retroactively establish probable cause for the August 19 arrest. Probable cause is assessed based on facts known to the arresting officer at the moment of arrest. Beck v. Ohio, 379 U.S. 89, 91 (1964). Guadarrama arrested Mr. Barnett for Class A child abuse — intentional or knowing conduct under § 76-5-109(3)(a). That requires the officer to have had probable cause to believe the conduct was intentional. The best any prosecutor could charge after full review of all evidence, including the video, was Class B reckless under § 76-5-109(3)(b) — a lesser mens rea filed by a different prosecutor seven months later with no new evidence. If the conduct was reckless at most, then Guadarrama's belief that it was intentional was objectively unreasonable. The downgrade from Class A intentional to Class B reckless does not cure the original arrest — it confirms it was overcalled. Moreover, under Devenpeck v. Alford, 543 U.S. 146 (2004), an officer must have had probable cause to arrest for some offense at the moment of arrest. Even accepting that Kelly's subsequent Class B theory has facial plausibility, that theory involves conduct the legislature expressly protected through the parental discipline safe harbor, charges no identified injury, and rests

on charging language that is internally self-defeating as described above. The subsequent filing does not establish that Guadarrama had probable cause on August 19, 2025.

85a.        Tenth, Defendants cannot escape liability by arguing that probable cause existed for some other offense not charged at the time of arrest. While Devenpeck v. Alford, 543 U.S. 146 (2004) permits arrest if PC exists for any crime, that doctrine does not rescue this arrest for three independent reasons. First, the probable cause inquiry is anchored to facts known to the arresting officer at the moment of arrest — not to charges a different prosecutor might theorize seven months later. Beck v. Ohio, 379 U.S. 89, 91 (1964). Guadarrama must have had PC for some offense on August 19, 2025, based on what he knew then. Second, the parental discipline safe harbor under § 76-5-109(4)(c)(i) is a statutory immunity that negates the criminality of the underlying conduct entirely — not merely a defense to a specific charge. If the conduct is protected by the safe harbor, there is no crime for which PC can exist, regardless of how the offense is labeled. A statutory immunity that removes conduct from the definition of criminal activity defeats Devenpeck at its root: there is no qualifying offense for which PC could exist. Third, the only other charge ultimately filed arising from the same incident was Disorderly Conduct — and as charged in the justice court information, it is an infraction, not a crime. Under Utah Code Ann. § 76-9-102(4), disorderly conduct is elevated to a Class C misdemeanor only if the conduct continues after a request to desist. Without that continuance after a request, it is merely an infraction — a civil penalty carrying no jail time and no criminal conviction. A warrantless custodial arrest requires PC for a criminal offense. Atwater v. City of Lago Vista, 532 U.S. 318 (2001). An infraction is not a criminal offense under Utah law and does not support a warrantless custodial arrest. Devenpeck's "any crime" standard requires

PC for a crime — it does not authorize custodial arrest for a civil infraction. Moreover, even treating Disorderly Conduct as a potential criminal charge, the elements require conduct intending to cause public inconvenience, annoyance, or alarm in a public place — a private father-daughter conversation in a restaurant is not conduct directed at the public and does not meet this element. And critically, this charge was not filed on August 19, 2025, but seven months later by a different prosecutor. The fact that Guadarrama did not charge or mention disorderly conduct at the time is a contemporaneous admission that he did not perceive PC for it. Post-hoc identification of a lesser charge by a different prosecutor does not establish that the arresting officer had PC for that offense when he made the arrest. The Devenpeck doctrine permits warrantless arrest where PC exists for any crime at the moment of arrest — it does not authorize an officer to arrest without PC and then retroactively substitute a civil infraction filed by someone else to insulate the arrest from constitutional scrutiny.

86. As a direct and proximate result of this unlawful arrest, Mr. Barnett suffered damages including loss of liberty, emotional distress, humiliation, damage to reputation, and attorney's fees.

## SECOND CAUSE OF ACTION

### Fourth Amendment — Unlawful Arrest (August 29, 2025)

### 42 U.S.C. § 1983

### Against Defendant Wallentine, Individually

87. Plaintiff realleges and incorporates all preceding paragraphs.

88. Deputy Wallentine's probable cause affidavit contained material misrepresentations. It listed the offense date as August 28, 2025 — the date of Wallentine's contact with Ms. Dunkley — when the messages that form the basis of the charge were sent on July 16, 2025 and August 4, 2025. It characterized Mr. Barnett's messages using inflammatory language — "psychotic Controll [sic] games" — that does not appear in any message Mr. Barnett sent, and which was Wallentine's own editorializing rather than a description of actual conduct. These misrepresentations, material to the probable cause determination, render the affidavit deficient under Franks v. Delaware, 438 U.S. 154 (1978). Deputy Wallentine also used deceptive contact — feigning assistance with Labor Day parenting time pickup — to locate Mr. Barnett and effectuate the arrest.

89. The warrantless custodial arrest independently violated Utah Code Ann. § 77-7-2. The charge was a Class B misdemeanor not committed in Deputy Wallentine's presence. Warrantless arrest on such a charge requires reasonable cause to believe the person will flee or that evidence will be destroyed. Neither applied: Wallentine knew Mr. Barnett's home address, workplace, and schedule from direct contact the prior day; and the alleged evidence — messages on the Talking Parents platform — was tamper-proof, third-party-hosted, and impossible for Mr. Barnett to delete or alter. No exigency existed.

90. The charge of electronic communications harassment, a Class B misdemeanor, did not have probable cause support. The messages at issue were sent through a court-designated co-parenting application, were not anonymous, and did not meet the elements of Utah Code Ann. § 76-12-202. The County Attorney declined to prosecute. The stalking upgrade to a third-degree felony sought by Detective Atwood was also declined by the County Attorney.

91. The arrest was carried out by a deputy who had specifically promised to help Mr. Barnett file a complaint against another deputy — and who arrived at Mr. Barnett's office under that false pretense with no paperwork and only an arrest. The formal complaint against Deputy Wallentine was never filed because the arrest preempted it. The timing, the method, and the pretext make clear the retaliatory nature of the detention.

92. As a direct and proximate result, Mr. Barnett suffered the damages described herein.

**THIRD CAUSE OF ACTION**

**Fourteenth Amendment — Substantive Due Process / Fundamental Right to Parent**

**42 U.S.C. § 1983**

**Against All Defendants**

93. Plaintiff realleges and incorporates all preceding paragraphs.

94. The right of a parent to the care, custody, and control of his children, and to be present in their lives including at school, is a fundamental liberty interest protected by the Fourteenth Amendment. Troxel v. Granville, 530 U.S. 57 (2000); Meyer v. Nebraska, 262 U.S. 390 (1923).

95. Defendants' conduct — including three arrests, an 8-month unilateral trespass ban from his children's schools imposed without court order or process, and continuing threats of arrest — deprived Mr. Barnett of this fundamental right without any legitimate governmental interest justifying such deprivation.

96. The school trespass ban was not authorized by any court order, entered without notice, hearing, or findings, and was not subject to any appeal or administrative review. It constitutes an arbitrary exercise of state power that shocks the conscience.

97. As a direct and proximate result, Mr. Barnett suffered the damages described herein.

## FOURTH CAUSE OF ACTION

### Fourteenth Amendment — Procedural Due Process

### 42 U.S.C. § 1983

### Against Cache County, Sheriff Jensen, and School District Defendants

98. Plaintiff realleges and incorporates all preceding paragraphs.

99. Mr. Barnett has a constitutionally protected property and liberty interest in being present at his children's school—a right secured by his court-ordered parenting plan, his status as a legal parent, and the Constitution itself.

100. The school trespass ban was imposed without notice, without a hearing, without written findings, and without any process for appeal or review. This violates the procedural protections of the Fourteenth Amendment. Mathews v. Eldridge, 424 U.S. 319 (1976).

101. As a direct and proximate result, Mr. Barnett suffered the damages described herein.

## FIFTH CAUSE OF ACTION

### First Amendment — Right of Familial Association

### 42 U.S.C. § 1983

### Against All Defendants

102. Plaintiff realleges and incorporates all preceding paragraphs.

103.     The First Amendment protects the right of familial association, including a parent's right to be present with his children at their school activities and events. This right extends to the children themselves.

104.     Defendants' conduct — the trespass ban, the arrests, and the open-ended condition that Mr. Barnett's access to his children's school would remain suspended until undefined domestic circumstances were "resolved" — directly and substantially burdened Mr. Barnett's right of familial association without adequate governmental justification.

105.     As a direct and proximate result, Mr. Barnett was excluded from every tennis match his daughter L.B. played, from Ridgeline High School football and basketball games, from school lunches with his children, from all other school events during the period of the ban, and is currently being excluded from the 2026 track season in which both L.B. and M.B. are competing. He was also nearly excluded from performing his daughter E.B.'s baptism — a once-in-a-lifetime religious ordinance — requiring court threat to preserve that right.

## SIXTH CAUSE OF ACTION

### First Amendment — Retaliation

### 42 U.S.C. § 1983

### Against Defendants Wallentine, Tanner, and Hansen, Individually

106.     Plaintiff realleges and incorporates all preceding paragraphs.

107.     Mr. Barnett engaged in constitutionally protected conduct, including: asserting his parenting rights through legal process and the court-designated co-parenting application; attempting to file a complaint against Deputy Wallentine for his conduct the prior evening; and communicating with law enforcement officers about the treatment he had received.

108.     The individual defendants took adverse action against Mr. Barnett — including arresting him at his workplace on the same morning he had arranged to file a complaint against Deputy Wallentine, thereby preventing that complaint from ever being filed — that would chill a person of ordinary firmness from continuing to exercise those rights.

109.     The retaliatory motive is evidenced by: the timing of the arrests; the deceptive contact used to locate Mr. Barnett before the August 29 arrest under the pretext of helping him obtain parenting time; Deputy Wallentine's use of a promise to deliver complaint paperwork as the mechanism to locate and arrest Mr. Barnett at his office — preempting the very complaint Mr. Barnett sought to file against Deputy Wallentine; and Sgt. Tanner's characterization of Mr. Barnett as pitching a "fit" about the trespass ban and being "not thrilled with how he's handling it" — statements reflecting that the officers viewed Mr. Barnett's assertion of his legal rights as the problem, not any specific unlawful conduct.

### SEVENTH CAUSE OF ACTION

**Monell — Unconstitutional Policy and Custom (Injunctive Relief Against Sheriff Jensen in Official Capacity)**

**42 U.S.C. § 1983**

**Against Cache County, Sheriff Jensen, and School District Defendants**

110.     Plaintiff realleges and incorporates all preceding paragraphs.

111.     Sheriff D. Chad Jensen, as the final policymaker for Cache County law enforcement under Utah Code Ann. § 17-22-1, is responsible for the policies, customs, and practices of the Cache County Sheriff's Office. Plaintiff seeks injunctive relief against Sheriff Jensen in his official capacity. Plaintiff does not at this time seek a Monell damages judgment against Cache County itself, reserving the right to add such a claim upon review of initial

disclosures, including any indemnification agreements and evidence of written policy or pattern and practice.

112.     This policy is directly evidenced by Sgt. Tanner's statements to Plaintiff's counsel: that the trespass was a collaborative recommendation between the Sheriff's Office and the school district; that it would remain in effect until the situation was "resolved"; that the standard was whether Mr. Barnett's presence might cause matters to "crescendo into some kind of dispute on school premises"; and that Tanner was "not thrilled" with Mr. Barnett asserting his rights. These statements describe a standing, open-ended deprivation of parental access conditioned on no articulable legal standard and subject to no judicial oversight — the definition of an unconstitutional custom.

113.     Cache County School District and Logan City School District have policies or customs of accepting and enforcing informal, extrajudicial trespass bans communicated by law enforcement without independent review, without notice to affected parents, and without procedural safeguards.

114.     The unconstitutional custom documented by Sgt. Tanner's statements — an open-ended, extrajudicial trespass ban on a legal parent imposed without court order, conditioned on an undefined standard of domestic resolution, and enforced by the threat of arrest — is an ongoing policy of the Cache County Sheriff's Office that continues to harm Mr. Barnett. Prospective injunctive relief against Sheriff Jensen in his official capacity is necessary and appropriate to remedy this continuing constitutional violation.

**EIGHTH CAUSE OF ACTION**

**Joint Action and Civil Conspiracy Under 42 U.S.C. § 1983**

**Against All Defendants**

115.     Plaintiff realleges and incorporates all preceding paragraphs.

116.     Defendants Wallentine, Maughan, Hansen, Tanner, Price, and Cara Dunkley entered into a conspiracy to deprive Mr. Barnett of the equal enjoyment of his constitutional rights. Deputy Maughan's role was to launder the conspiracy through official process: by conducting a one-sided lethality assessment that labeled Mr. Barnett a lethal threat without interviewing him, entering that finding into a statewide criminal database, recommending no bail on a misdemeanor the County Attorney then declined, and personally coaching Ms. Dunkley to seek a protective order — all without a single question asked of the accused. Detective Hepworth's closure of the M.B. threatening text investigation without investigating L.B.'s or Ms. Dunkley's role is consistent with and in furtherance of this pattern, though his involvement post-dates the primary conspiratorial conduct.

117.     The conspiracy is evidenced by: (a) the coordination between Ms. Dunkley's complaints and the timing of arrests; (b) Ms. Dunkley's direct provision of screenshot evidence to deputies and her request that Mr. Barnett be monitored; (c) the deputies' admission that they advised Ms. Dunkley to seek a protective order; (d) the completion of a Lethality Assessment with Ms. Dunkley following the August 29 arrest, the results of which were entered into UCJIS and used in subsequent proceedings; (e) the deceptive use of a parenting-time pretext to effectuate an arrest; (f) the arrest occurring on the morning Mr. Barnett had arranged to file a complaint against Deputy Wallentine, preempting that complaint; and (g) the uniform refusal to hear Mr. Barnett's side of any incident before taking adverse action against him.

118.     Each co-conspirator performed overt acts in furtherance of the conspiracy.

119.    As a direct and proximate result, Mr. Barnett suffered the damages described herein.

## NINTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress (State Law)

### Against Cara Ann Dunkley and Individual Officer Defendants

120.    Plaintiff realleges and incorporates all preceding paragraphs.

121.    Ms. Dunkley engaged in a course of outrageous conduct calculated to cause severe emotional distress, including: orchestrating or facilitating the filing of false or exaggerated criminal complaints against Mr. Barnett; coordinating with law enforcement to have him arrested; orchestrating or facilitating the school trespass ban to exclude him from his children's activities; testifying at the September 18, 2025 protective order hearing that she did not want Mr. Barnett to attend E.B.'s baptism, and relenting only after being served with a motion to enforce and the credible threat of three days jail per violation — not voluntarily, and not out of any concern for E.B.'s relationship with her father; and, upon information and belief, directing or encouraging L.B. to use a friend's phone to send threatening messages to M.B. to create a false impression of threatening conduct by or toward Mr. Barnett.

122.    Ms. Dunkley's and the Individual Officer Defendants' conduct was intentional and outrageous, exceeded all bounds tolerated by decent society, and was directed at a person she knew to be particularly vulnerable by reason of his parental bond with his children.

122a.   The Individual Officer Defendants independently engaged in conduct constituting intentional infliction of emotional distress under Utah law. Deputy Maughan entered an

armchair psychological diagnosis into an official police report — concluding that Mr. Barnett "appears not over the divorce, is jealous and is still trying to control Cara's life" — without ever speaking to Mr. Barnett, and then actively coached Ms. Dunkley to seek a protective order and directed her to CAPSA for assistance. Deputy Wallentine appeared at Mr. Barnett's residence at 9:30 p.m. on August 28, 2025, under the false pretext of helping him secure his children for Labor Day weekend, while having already developed probable cause for his arrest. Deputy Wallentine lured Mr. Barnett to his own workplace under the false promise of helping him file a complaint against Wallentine, then arrested him in front of his employees. Sgt. Tanner threatened Plaintiff's counsel that if Mr. Barnett set foot on school property, Tanner would personally come to arrest him — a threat designed to terrorize a father out of exercising his court-ordered parental rights. This coordinated course of conduct — sustained over months, involving multiple officers, targeting a father's relationship with his children — is outrageous conduct that exceeds all bounds tolerated by a civilized society and was calculated to cause, and did cause, severe emotional distress.

123.     As a direct and proximate result of the conduct of Ms. Dunkley and the Individual Officer Defendants, Mr. Barnett has suffered severe emotional distress, including anxiety requiring prescription medication, loss of sleep, loss of liberty, diminished quality of life, and harm to his familial relationships.

## TENTH CAUSE OF ACTION

### Fourth Amendment — Unlawful Seizure of Property

### 42 U.S.C. § 1983

### Against Deputy Hayden D. Wallentine, Individually

124.     Plaintiff realleges and incorporates all preceding paragraphs.

125.     On August 29, 2025, Deputy Wallentine seized Mr. Barnett's three cell phones at the time of arrest. Deputy Wallentine did not have a warrant to seize the cell phones. Deputy Wallentine lacked probable cause to seize the cell phones. The phones were Mr. Barnett's business instruments, not contraband, and bore no plausible evidentiary connection to the charge of electronic communications harassment — which involved messages sent through a court-designated co-parenting application preserved in tamper-proof form on a third-party platform. No information on the seized phones could have been relevant to the charged offense; any relevant communications were already fully preserved on the Talking Parents platform without any need to seize the phones.

126.     The three phones were retained for approximately five to six weeks. Law enforcement was unable to unlock them. No meaningful forensic examination was conducted. The phones were returned with no evidence having been extracted. The seizure served no legitimate law enforcement purpose and caused Mr. Barnett significant harm, including loss of his ability to operate his business during the weeks the phones were held.

127.     As a direct and proximate result of the unlawful seizure, Mr. Barnett suffered damages including but not limited to loss of his ability to use the cell phones for his work, loss of business income, and harm to his business operations.

**ELEVENTH CAUSE OF ACTION**

**Malicious Prosecution (State Law)**

**Against Cara Ann Dunkley and Individual Officer Defendants**

128.     Plaintiff realleges and incorporates all preceding paragraphs.

129.    Defendants initiated, or caused to be initiated, criminal proceedings against Mr. Barnett in the absence of probable cause and with malice, including the August 19 child abuse charge and the August 29 electronic communications harassment charge.

130.    Both original charges — Class A misdemeanor child abuse and Class B misdemeanor electronic communications harassment — were declined by the County Attorney. The felony stalking upgrade sought by Detective Atwood was also declined by the County Attorney on October 13, 2025. Seven months after the DA's declination, on March 16, 2026, Providence City Attorney Kelly J. Smith filed a criminal information in Justice Court on the August 19 incident with downgraded and modified charges. The continued prosecution — brought seven months after the County Attorney declined prosecution — is itself evidence of the ongoing abuse of process described herein.

131.    Defendants acted with malice, as evidenced by their coordination with Ms. Dunkley, their failure to conduct independent investigation, and the use of law enforcement processes to advance private domestic litigation objectives.

132.    As a direct and proximate result, Mr. Barnett suffered the damages described herein.

### TWELFTH CAUSE OF ACTION

**Abuse of Process (State Law)**

**Against Cara Ann Dunkley**

133.    Plaintiff realleges and incorporates all preceding paragraphs.

134.     Abuse of process requires (1) an ulterior purpose and (2) a willful act in the use of process not proper in the regular conduct of the proceeding. Hatch v. Davis, 147 P.3d 383, 389 (Utah 2006); Gilbert v. Ince, 1999 UT 65, ¶ 17, 981 P.2d 841.

135.     Ms. Dunkley initiated, encouraged, or facilitated the filing of criminal complaints against Mr. Barnett — including the August 19, 2025 child abuse report and the August 29, 2025 harassment complaint — not for the legitimate purpose of vindicating a criminal wrong, but for the ulterior purpose of gaining tactical advantage in the parties' ongoing custody and domestic dispute, excluding Mr. Barnett from his children's lives, and using the threat and fact of arrest to coerce his compliance with her preferred parenting arrangements.

136.     The improper purpose is evidenced by: (a) the timing of criminal reports in close proximity to parenting-time disputes and custody proceedings — specifically, the first arrest occurring five days after service of a custody modification petition, with zero law enforcement involvement in the approximately three years since the resolution of the 2021/2022 custody-related proceedings; (b) the identical pattern from the prior custody modification petition, after which the last protective order against Mr. Barnett was also obtained — demonstrating that Cara's response to custody modification petitions is not to litigate them on the merits but to generate criminal involvement and obtain protective orders; (c) Ms. Dunkley's active coordination with deputies in gathering and presenting evidence; (d) deputies' own reports reflecting that Ms. Dunkley sought Mr. Barnett's arrest, advised the school district, and was kept apprised of enforcement steps; (e) the complete absence of serious prosecutorial support — both charges were declined; and (f) the use of criminal process to obtain a de facto school trespass ban and protective order that were

never sought through proper family court channels; and (g) most starkly, Ms. Dunkley caused Mr. Barnett to be arrested on a felony third-degree protective order violation on December 2, 2025 — the day before his scheduled custody modification hearing on December 3, 2025 — despite the alleged violation having occurred over a month earlier. Mr. Barnett was held overnight and transported from jail to the First District Court the following morning — appearing at his custody modification hearing in a prison jumpsuit, handcuffed. The underlying conduct alleged to constitute the felony PO violation involved communications Mr. Barnett sent regarding jointly-owned investment properties that were facing imminent foreclosure by Arbor Bank — a financial crisis arising directly from this Court's own July 2025 order requiring Mr. Barnett to sign trust deeds. The bank had issued a November 5, 2025 deadline to cure. Mr. Barnett communicated to Ms. Dunkley about a crisis that threatened her financial interests as much as his own. Rather than cooperating to resolve the foreclosure, Ms. Dunkley extracted trust deed liens on virtually all of Mr. Barnett's non-federally-backed properties — then waited over a month before reporting the communications as a felony violation, timed precisely to ensure Mr. Barnett would be in custody for his custody modification hearing. The message concerned a financial matter between the parties. Ms. Dunkley's own response to that message stated, in substance, that the parties should "discuss things like before with the prior PO" and asked Josh to "stop the harassing texts" — explicitly referencing the prior protective order's communication framework. The prior protective order (Case No. 224100017) had permitted communications through the Talking Parents application beyond mere child exchange logistics. The new 2025 protective order (Case No. 254100490) restricted communications to child exchange messages only. Josh, relying in good faith on Ms. Dunkley's own

message invoking the prior PO's broader communication standard, sent a message about finances — a topic that would have been permitted under the framework Ms. Dunkley herself referenced. Ms. Dunkley then waited weeks before reporting this communication as a felony protective order violation — timing the report to maximize its impact on the pending custody modification proceeding. A father appearing before a family court judge in a jail jumpsuit and shackles, on a felony charge arising from a finance message that his own ex-wife's response had implicitly invited, filed weeks later and days before his custody hearing, is not an incidental consequence of legitimate law enforcement — it is the precise tactical result that the improper use of criminal process was designed to achieve.

137.      Ms. Dunkley's conduct went beyond merely initiating process — she actively directed and participated in its use, providing screenshots, making statements to deputies, coordinating with Sgt. Hansen and Deputy Price regarding the school trespass, and seeking to leverage the arrest and JRA no-contact condition — which applied to her, not to the children — to further restrict Mr. Barnett's access to his children outside of any court order.

133a.      The Individual Officer Defendants independently engaged in abuse of process. Deputy Wallentine used law enforcement process — the stated premise of helping Mr. Barnett arrange parenting time — as a pretext to locate and arrest him, converting a parenting time assistance call into a trap. Deputy Wallentine used the complaint process — inviting Mr. Barnett to his own workplace to file a formal complaint against Wallentine — as a mechanism to arrest him instead, with no paperwork and no complaint ever filed. These officers used the forms and procedures of legitimate law enforcement not for their proper purpose but to locate, lure, and detain a person against whom they had already decided to act. Sgt. Hansen and Sgt. Tanner used the school notification and trespass process not for

the legitimate purpose of protecting students but to restrict a legal parent's access to his children's school events without any court order, hearing, or finding — a use of official process for an improper purpose that falls squarely within the definition of abuse of process under Utah law.

138.      As a direct and proximate result of Ms. Dunkley's and the Individual Officer Defendants' abuse of process, Mr. Barnett suffered the damages described herein, including three arrests, loss of liberty, exclusion from his children's school lives, emotional distress, and economic harm. Mr. Barnett also has a prior conviction arising from violation of an earlier protective order obtained by Ms. Dunkley following a prior custody modification petition — a conviction that itself reflects the same pattern of Cara weaponizing the protective order process in response to Josh's exercise of his legal parenting rights. The arrests described in this complaint are consistent with that established pattern.

### V. CLAIM FOR INJUNCTIVE RELIEF

139.      Plaintiff realleges and incorporates all preceding paragraphs.

140.      Plaintiff has no adequate remedy at law for the ongoing infringement of his constitutional right to be present at his children's school activities. Each missed event is an irreparable loss; monetary damages cannot restore the experiences Plaintiff and his children have lost.

141.      Plaintiff faces a credible, ongoing threat of future harm. Sgt. Tanner confirmed the trespass would remain until the situation was "resolved" — an undefined, open-ended condition entirely within the Sheriff's Office's discretion to lift or maintain. No court order

has ever authorized the ban. The conditions that produced it remain unchanged. Absent an injunction, Plaintiff will continue to be excluded from his children's school lives at the discretion of officers who have already demonstrated they view his assertion of parental rights as the problem.

142.      The balance of harms favors injunctive relief. Defendants suffer no cognizable harm from being required to comply with the Constitution. Mr. Barnett and his children suffer ongoing, irreparable harm from the current unconstitutional restrictions.

143.      Plaintiff requests a permanent injunction, or in the alternative a preliminary injunction, ordering:

(a) That the Cache County Sheriff's Office, the Cache County School District, the Logan City School District, and all of their officers, agents, employees, and representatives are prohibited from enforcing, maintaining, or threatening to enforce any trespass ban against Joshua Lee Barnett at any Cache County or Logan City school absent a valid court order entered after notice and an opportunity to be heard;

(b) That the Cache County Sheriff's Office and all of its officers, deputies, agents, and employees are prohibited from arresting, detaining, or threatening to arrest or detain Joshua Lee Barnett for exercising his lawful parenting rights, including attending school events, absent individualized probable cause based on specific articulable criminal conduct—and that no such arrest shall be made on the basis of co-parenting application communications, school pickup activity, or attendance at children's extracurricular events in which he has a lawful parental interest;

(c) That Cache County, the Sheriff, and the School Districts are required to implement written policies and procedures governing the imposition of school trespass orders against parents with legal parenting rights, including requirements of written notice, written findings, and a hearing process;

(d) Such other injunctive relief as the Court finds necessary and proper to remedy the ongoing constitutional violations alleged herein.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joshua Lee Barnett respectfully requests judgment as follows:

1. A declaration that Defendants' conduct violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution;

2. A permanent injunction (or preliminary injunction pending trial) as described in Count V above, prohibiting the Cache County Sheriff's Office—in its entirety—and the School Districts from enforcing any trespass ban against Plaintiff absent a valid court order, and from arresting Plaintiff for exercise of lawful parenting rights absent specific probable cause;

3. Compensatory damages against all Defendants in an amount to be determined at trial, for loss of liberty, emotional distress, loss of parenting time, loss of irreplaceable school events and memories, economic harm to Plaintiff's household, and other injuries;

4. Punitive damages against the individual Defendants whose conduct was willful, wanton, reckless, and malicious;

5. Attorney's fees and costs pursuant to 42 U.S.C. § 1988;

6. Pre-judgment and post-judgment interest as provided by law;

7. Such other and further relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff Joshua Lee Barnett demands a trial by jury on all claims so triable, pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure.

Dated: _____

Respectfully submitted,

/s/ Bret P. Bryce
**Bret P. Bryce**
Utah Bar No. 13042
BRYCE LAW P.L.L.C.
140 W 9000 S, Suite 9
Sandy, Utah 84070
Tel: 801.696.4644
bret@brycelawoffices.com
Attorney for Plaintiff Joshua Lee Barnett